# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

LORI ARVIZU,

        Plaintiff,

   v.

ANDREW SAUL,
Commissioner of Social Security,[1]

        Defendant.

_____/

Case No. 1:19-cv-00128-SKO

ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT

(Doc. 1)

## I.   INTRODUCTION

On January 29, 2019, Plaintiff Lori Arvizu ("Plaintiff") filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") under the Social Security Act (the "Act"). (Doc. 1.) The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on September 12, 2019). He is therefore substituted as the defendant in this action. *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

K. Oberto, United States Magistrate Judge.[2]

## II. BACKGROUND

On March 16, 2015, Plaintiff protectively applied for DIB, alleging disability beginning on June 24, 2014, due to injuries to her heels, feet, knees, hips, and due to bone spurs. (Administrative Record ("AR") 18, 67–68, 81–82, 207, 217, 226, 257.) Plaintiff was born on April 22, 1961 and was 53 years old on the alleged disability onset date. (AR 38, 67, 81, 207, 226, 257.) Plaintiff has a high school education and can communicate in English. (AR 39, 216, 218.)

**A.     Relevant Medical Evidence[3]**

   **1.     Kaiser Permanente**

Plaintiff presented with bilateral foot pain on August 15, 2014, following surgery. (AR 1049–62.) Her physical examination showed post-operative scars on her feet, with no swelling. (AR 1056.) Plaintiff was noted to have tenderness in her fore foot and arches. (AR 1056.) She was assessed with bilateral planta fasciitis and prescribed medication. (AR 1056.)

   **2.     John Santaniello, M.D.**

On December 3, 2014, Plaintiff underwent a qualified medical evaluation and examination by Dr. Santaniello. (AR 535–51.) She reported that she has daily pain in both knees and in both feet, which is aggravated by walking, standing more than 15 minutes, sitting, kneeling, and climbing. (AR 537.) Plaintiff also reported stiffness, weakness, and swelling in her knees and numbness and tingling in both feet. (AR 537.)

On examination, no effusions or atrophy was noted. (AR 546.) Dr. Santaniello observed tenderness both over the medial and lateral joint line and over the medial patella bilaterally. (AR 546.) Plaintiff had a positive "McMurray test" over her lateral meniscus bilaterally. (AR 546.) Dr. Santaniello found that the patellofemoral compression test caused Plaintiff pain but there is no crepitation bilaterally.  (AR 547.)  Ligamentous testing revealed good stability anteriorly posteriorly medially and laterally in Plaintiff's bilateral knees. (AR 547.)

Dr. Santaniello assessed plantar fasciitis and heel spur in both feet; status post plantar

---

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 6, 8.)
[3] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issue.

2

fasciotomy and excision of bone spur in both feet; knee tear of lateral meniscus and chondromalacia of the patella in both knees; and rule out neuropathy in both feet. (AR 548.) He recommended that Plaintiff undergo electrodiagnostic studies of the bilateral lower extremities and MRI studies of the bilateral feet and noted that Plaintiff is a candidate for arthroscopic surgery and should be referred to an orthopedic surgeon for further evaluation and treatment. (AR 548.)

Dr. Santaniello opined that Plaintiff would have a work restriction of "semisedentary work" where she has ability to sit and stand at will, but would not be able to kneel, squat, crawl, or do any "heavy lifting" over 15 pounds. (AR 549.)

### 3. Trevor Scott, M.D.

On July 25, 2015, Plaintiff presented to Dr. Scott for a "complete orthopedic evaluation." (AR 480–88.) She complained of bilateral knee, ankle, and foot pain. (AR 480.) According to Plaintiff, her pain is attributed to accumulative trauma from working as a pharmacy technician, although there was no acute injury. (AR 480.) She indicated the pain is in her left hip, bilateral knees, ankles, and feet, and is worse with activity but also present at rest. (AR 480.)

On examination, Plaintiff was able to get on and off the examination table without difficulty. (AR 481.) She ambulated without difficulty or use of an assistive device, was able to "toe walk" and "heel walk," and was able to squat fully and return to a standing position without help or support. (AR 482.) She had tenderness in her left hip, but no swelling and full range of motion. (AR 485.) Plaintiff's knees showed no deformity, scars, or masses. (AR 485.) Dr. Scott noted that there was tenderness to palpation on the medial, lateral, and patellofemoral joint line, bilaterally. (AR 485.) Her knees were stable with normal range of motion, but her "McMurray's test" was "irritable." (AR 485.)

Plaintiff's ankles had no deformity, scars, masses, or swelling. (AR 485.) Dr. Scott noted tenderness to palpation at the tibiofibular joint, bilaterally, and pain with forced extension. (AR 485.) He also found edema over the left aspect of Plaintiff's ankle. (AR 485.) Plaintiff's ankles were noted to be stable with normal range of motion. (AR 486.) Dr. Scott found Plaintiff's feet had no gross deformity or masses. (AR 486.) He noted "well-healed surgical scars" and "palpable scar tissue over the plantar fascia from prior plantar fascial releases, bilaterally." (AR 486.) Range

of motion in Plaintiff's feet was normal. (AR 486.) Her straight-leg raising tests were normal, and no muscle weakness was noted. (AR 486–87.)

Dr. Scott's impression was that his findings were consistent with bilateral knee osteoarthritis, likely ankle osteoarthritis, and bilateral recalcitrant plantar fasciitis. (AR 487.) He opined that Plaintiff can lift or carry 20 pounds occasionally and 10 pounds frequently. (AR 487.) Plaintiff can stand and walk up to 6 hours out of an 8-hour workday, without the need for assistive devices. (AR 487–88.) Dr. Scott opined that Plaintiff can bend, crouch, and perform other postural activities occasionally. (AR 488.) She has no manipulative or workplace environmental limitations. (AR 488.)

### 4. Birgit Siekerkotte, M.D.

Plaintiff underwent a comprehensive internal medicine evaluation by Dr. Siekerkotte on January 20, 2016. (AR 495–98.) Plaintiff complained that she has bilateral meniscus tear, degenerative joint disease of the knees, plantar fasciitis with persistent pains despite surgery, and heel spurs. (AR 495.) She reported that she takes care of her personal needs and is able to do sweeping, mopping, vacuuming, dishes, laundry, shopping, and cooking. (AR 495.) Dr. Siekerkotte noted Plaintiff walked with "a minimal slight limp, otherwise normal." (AR 497.) Plaintiff's muscle strength was normal (5/5) with no sensory deficits or asymmetries. (AR 498.) Dr. Siekerkotte found Plaintiff had "bilateral patellar motion tenderness on the right side," and that her "patella [] also hurts when touched lightly." (AR 498.)

Dr. Siekerkotte opined that Plaintiff could stand up to six hours with rests/breaks and change of position and had no sitting limitations. (AR 498.) She could lift/carry 50 pounds occasionally and 25 pounds frequently based on her knee tenderness and the patella motion tenderness. (AR 498.) Plaintiff could occasionally climb stairs and ladders, crouch, and kneel. (AR 498.) Dr. Siekerkotte found Plaintiff could frequently stoop but should avoid crawling. Plaintiff had no limitations for reaching, handling, fingering, or feeling, especially from a seated position, but should limit working around heavy machinery based on her "exquisite patella tenderness on the right and bilateral patella motion tenderness." (AR 498.)

///

### 5. Marshall S. Lewis, M.D.

On March 28, 2016, Plaintiff presented for a "initial comprehensive orthopedic evaluation" by Dr. Lewis, her treating physician. (AR 510–30.) She complained of pain in her bilateral feet and bilateral knees. (AR 510.) Plaintiff reported that, over time while working, she sustained injuries on a day to day basis and developed cumulative trauma due to repetitive movements that were part of her job duties. (AR 511–12.) She stated she has difficulties with prolonged standing, walking, sitting, bending, stooping, kneeling, squatting, pushing, pulling, lifting, and carrying. (AR 515.)

Dr. Lewis indicated he had reviewed Dr. Santaniello's examination report. (AR 520–21.) Upon visual inspection of Plaintiff's bilateral knees, Dr. Lewis noted that there are no obvious scars, deformity, atrophy, or edema. (AR 521.) Plaintiff had a "positive McMurrays test, a positive Thessalys test, and a positive Patellar Grind test bilaterally." (AR 522.) Plaintiff's anterior and posterior "Drawer tests were negative and there was no increased laxity observed as Valgus and Varus stress test was applied." (AR 522.) Dr. Lewis noted Plaintiff was significantly tender to palpation over both the medial and lateral tibiofemoral joint spaces bilaterally. (AR 522.) Her bilateral strength rating was "at 4/5 upon flexion and extension at the knees against resistance." (AR 522.)

Upon visual inspection of Plaintiff's bilateral foot and ankle revealed "several well healed surgical scars present from [Plaintiff's] previous surgical interventions." (AR 522.) No other obvious scars, deformity, atrophy, or edema were noted by Dr. Lewis. (AR 522.) Plaintiff maintained "full active and passive range of motion over the bilateral ankles," but reported "some tightness at the end points in range of motion movement." (AR 522.) Dr. Lewis observed Plaintiff was "significantly tender to palpation over both the origin and insertion of the plantar fascia bilaterally and significantly tender to palpation over the calcaneal tuberosity bilaterally." (AR 522.) No "gross instability" was observed. (AR 522.) Plaintiff's anterior "Drawer test," "Squeeze test," "Talar tilt test," and "lateral metatarsal compression test" were all negative. (AR 522.) Dr. Lewis observed Plaintiff walked with a "non-antalgic gait without the use of a cane or any other assisting devices." (AR 522.)

Dr. Lewis diagnosed Plaintiff with a "[l]ateral meniscus tear of the anterior horn"; "[l]ateral meniscus tear at the junction anterior horn mid-body extension of the superior articular surface of the right knee"; "[s]tatus post plantar fasciotomy bilaterally with recurrent persistent symptoms of plantar fasciitis per clinical examination"; and "[b]ilateral knee and foot pain." (AR 523.) He opined that Plaintiff could return to work, with the restrictions of "semi-sedentary work where she has the ability to sit and stand at will; she should not be able to kneel, squat, crawl, or do any heavy lifting over 15 pounds, per Dr. Santaniello." (AR 526.)

Plaintiff presented for another "comprehensive orthopedic evaluation" with Dr. Lewis on October 5, 2016, regarding pain in her knees and feet. (AR 1775–82.) Plaintiff indicated that she underwent a right knee arthroscopy in June 2016, but that her condition had not improved. (AR 1776.) Plaintiff reported that her activities of daily living had improved, including cleaning house, grooming, dressing, and preparing meals. (AR 1776.)

On examination of her right knee, Plaintiff reported considerable pain with palpation over the media tibiofemoral joint line. (AR 1777.) Dr. Lewis noted no gross instability and her valgus and Varus stress tests were negative. (AR 1777.) Plaintiff's strength rating was found to be diminished at 4/5 in the right lower extremity. (AR 1777.) Dr. Lewis diagnosed Plaintiff with "[l]ateral meniscus tear at the junction of the anterior horn and mid body with extension into the superior articular surface right knee"; "[m]ild to moderate chondromalacia patellae at the lateral patellar facet right knee"; "[l]ateral patellar subluxation, 20 mm, right knee"; "[r]ight knee pain."; and "[s]tatus-post right knee arthroscopy, June 27, 2016." (AR 1777.) He recommended injections and therapy. (AR 1778.)

Dr. Lewis conducted another "comprehensive orthopedic evaluation" of Plaintiff on March 8, 2017, to "follow up" on injuries sustained in the workplace to her feet and knees. (AR 1797–1802.) Visual inspection of Plaintiff's right knee revealed well healed post-operative scars, with no other deformities, masses, atrophy, or edema. (AR 1798.) Dr. Lewis noted an "increase in varicosities over the lower extremities." (AR 1798.) He also noted Plaintiff "continue[d] to demonstrate losses in active range of motion over the right knee." (AR 1798.)

6

Following his examination, Dr. Lewis performed a "corticosteroid injection into the lateral tibiofemoral joint line" of Plaintiff's right knee. (AR 1798.) He opined that Plaintiff could return to work with no kneeling or squatting, "per Dr. Nijjar." (AR 1799.)

Plaintiff presented for another "comprehensive orthopedic evaluation" by Dr. Lewis on September 12, 2017. (AR 1825–30.) He noted that with medications, Plaintiff is more capable of performing activities of daily living. (AR 1825–26.) He also observed that authorization for right knee surgery had been requested but not yet approved. (AR 1826.) On examination of Plaintiff's knees, Dr. Lewis observed that she has "full flexion and extension of the left knee," but limited extension in her right knee. (AR 1826.) Plaintiff reported "tenderness to palpation over the bilateral tibiofemoral joint spaces both medially and laterally." (AR 1826.) Dr. Lewis found "no gross instability" as "Varus/Valgus stress tests" and "[a]nterior drawer and posterior drawer tests" were both negative. (AR 1826.) Plaintiff was noted to ambulate without the use of a cane or any other assisted devices. (AR 1826.) Dr. Lewis noted that her "[s]trength rating still appears to be deficient at 4/5 on knee flexion and extension against resistance." (AR 1826.)

Dr. Lewis diagnosed Plaintiff with "[l]arge displaced tear anterior horn of the right lateral meniscus, per MRI of 12/15/2016"; "[t]ricompartmental chondromalacia right knee with large joint effusion and contrast-imbibing Bakers cyst, per MRI of 12/15/2016; "[s]tatus post right knee arthroscopy, per Dr. Marshall Lewis on 06/27/2016"; and "[d]isplaced fragment of lateral meniscus migrating to the anterolateral joint line, i.e. Loose body per MRI arthrogram, December 15 2016." (AR 1826.) Dr. Lewis recommended that Plaintiff pursue a consultation for additional surgery and that she avoids kneeling and squatting, per Dr. Nijjar's December 2016 assessment. (AR 1827.)

**6.   Mohinder Nijjar, M.D.**

Plaintiff underwent a "agreed medical evaluation" by Dr. Nijjar on May 16, 2016. (AR 1703–18.) She complained of pain in her feet, knees, and left hip. (AR 1705.) Dr. Nijjar noted Plaintiff ambulated with no limp. (AR 1714.) Dr. Nijjar's examination of Plaintiff's hips was normal. (AR 1714.) Plaintiff's left knee had no deformity, effusion, retinacular laxity, instability, or tenderness. (AR 1714.) Her "[a]nterior drawer sign," "posterior drawer sign," and "Lachman's" were negative. (AR 1714.) Dr. Nijjar noted Plaintiff's "McMurray and Apley grinding tests [were]

7

negative." (AR 1714.)

Plaintiff's right knee had no deformity, effusion, retinacular laxity, instability, or tenderness. (AR 1714.) Her "[a]nterior drawer sign," "posterior drawer sign," and "Lachman's" were negative. (AR 1714.) Dr. Nijjar noted Plaintiff's "McMurray and Apley grinding tests [were] negative." (AR 1714.) "Mild coarse crepitus" was present in the knee joint. (AR 1714.) Dr. Nijjar noted that the range of motion in both of Plaintiff's knees was normal. (AR 1714.)

Dr. Nijjar examined Plaintiff's ankles, and found normal range of motion, with no deformity, localized tenderness, fusion, thickening, crepitus, or Varus or valgus deformity. (AR 1714–15.) Her "[a]nterior drawer sign" was negative, and the "peroneal tendons and posterior tibial tendons show[ed] no localized tenderness." (AR 1714.) Examination of Plaintiff's feet showed "well-healed surgical scars from the plantar fasciotomy and excision of fibromatosis." (AR 1715.) Dr. Nijjar noted her scar is "[n]on-hypertrophic" and "non-tender." (AR 1715.) Plaintiff had no instability or deformity and her "Windlass test" was negative. (AR 1715.) Her "[d]orsalis pedis, posterior tibial, and popliteal pulses [were] palpable and with good volume." (AR 1715.) The neurologic examination of Plaintiff's bilateral extremity was normal. (AR 1715.)

Dr. Nijjar diagnosed Plaintiff with bilateral plantar fasciitis, status post-surgical decompression and excision calcaneal spur; "[m]ild chondromalacia patella bilateral knee with degenerative patterns identified on MRI scan in the lateral meniscus"; and left hip pain. (AR 1715.) He opined that she could "return to regular work using special shoes with orthosis." (AR 1716.)

Dr. Nijjar re-examined Plaintiff on December 12, 2016. (AR 1721–37.) Plaintiff complained of pain in the right knee that increased with prolonged standing, walking, kneeling, and squatting. (AR 1722.) She also stated her knee swells and that she has limited range of motion. (AR 1722.) Dr. Nijjar observed that Plaintiff was ambulating with minimal limp in the right lower extremity. (AR 1734.) On examination, Plaintiff had some mild effusion in the knee joint and showed "some signs of magnification when attempting patellofemoral joint evaluation." (AR 1735.) She has mild crepitus in the patellofemoral area. (AR 1735.) She had no signs of patellar tendonitis and no medial or lateral instability or tenderness. (AR 1735.). Plaintiff's "[a]nterior drawer sign," "posterior drawer sign," "Lachman's sign," and "McMurray and Apley grinding

tests" were all negative.  (AR 1735.)

Dr. Nijjar assessed Plaintiff with "[d]egenerative lateral meniscal changes right knee, status post-surgical partial lateral meniscectomy and debridement of the knee, including the excision of loose body with lateral release."  (AR 1735.)  He opined that Plaintiff could return to modified work while avoiding prolonged repetitive kneeling and squatting, with no limitations on standing or walking.  (AR 1736.)

Plaintiff presented with another re-evaluation by Dr. Nijjar on September 18, 2017.  (AR 1834–42.)  Dr. Nijjar noted that since her prior examination, Plaintiff underwent physical therapy and had a repeat MRI scan done for the right knee, which "showed minor fragments of the area of the surgical partial meniscectomy but no significant displaced fragments were identified."  (AR 1835.)  Plaintiff complained of constant right knee pain and occasional-to-constant left knee pain.  (AR 1835.)  She also complained of pain and swelling in her feet and ankles.  (AR 1835.)  Her activities of daily living were noted to be minimally-to-not-affected by the alleged impairments.  (AR 1835.)

The examination of Plaintiff's hips was normal.  (AR 1839.)  Examination of Plaintiff's right knee showed "a surgical scar, well-healed, non-hypertrophic, non-tender" and with no effusion present.  (AR 1839.)  Dr. Nijjar noted the presence of "[m]ild coarse crepitus is present."  (AR 1839.)   There was no "subluxation of the retinacula around the knee" and no "significant Varus or valgus deformity."  (AR 1839.)  Plaintiff's knee had good stability, and her "[a]nterior drawer sign," "posterior drawer sign," "Lachman's sign," and "McMurray and Apley grinding tests" were all negative.  (AR 1839.)  Plaintiff's left knee had no crepitus or effusion.  (AR 1839.)  Her alignment, stability, and range of motion were good, and her "[a]nterior drawer sign," "posterior drawer sign," "Lachman's sign," and "McMurray and Apley grinding tests" in this knee were also all negative.  (AR 1839.)  Dr. Nijjar also found Plaintiff's neurological examination to be normal.  (AR 1839.)

Dr. Nijjar's examination of Plaintiff's ankles showed no deformity, tenderness or effusion, with normal stability.  (AR 1840.)  Her "[a]nterior drawer sign" was negative, and "[n]o synovial hypertrophy" could be palpated.  (AR 1840.)  The examination of Plaintiff's feet showed no

tenderness or deformity, and her "[s]tress test," "Windlass test," and "Crowding test" were all negative. (AR 1840.)  Dr. Nijjar noted a "[s]light prominence" at the base of the right metatarsal phalangeal joint of Plaintiff's little toe. (AR 1840.) He diagnosed her with "[r]ight knee mild degenerative arthritis with partial lateral meniscectomy, 06/27/2016": "[b]ilateral plantar fasciotomy 06/2013, and 10/2013, right and left foot"; and "[p]ain in the ankle and feet with radiation towards the left hip." (AR 1840.)

> Dr. Nijjar opined that Plaintiff
> 
> can return to regular work avoiding standing more than one hour at a time.  She can work eight hours with no lifting, pushing, pulling, [or] carrying over thirty pounds. As her job does not require this, she can return to regular work.

(AR 1841.) Dr. Nijjar recommended that Plaintiff continue using occasional over-the-counter non-narcotic medication for pain as necessary and did not believe she required further surgical intervention. (AR 1842.)

**B.   Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on September 22, 2015, and again on reconsideration on March 15, 2016. (AR 100–105, 109–14.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 117–35.)

On November 7, 2017, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions. (AR 38–56.) Plaintiff testified that had four surgeries to her feet, but her pain symptoms are not relieved. (AR 45.) She also testified that she suffers from pain and swelling in her knees. (AR 46–47, 54.) She can only stand for five minutes without pain in her feet and knees and can walk no more than a block. (AR 53, 54.)

A Vocational Expert ("VE") also testified at the hearing. (AR 56–64.) She testified that Plaintiff had past relevant work as a pharmacy technician, Dictionary of Operational Titles ("DOT") code 074.382-010, which was semi-skilled and light exertional work—medium as performed—with a specific vocational preparation (SVP)[4] of 3. (AR 57.) The ALJ asked the VE

---

[4] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id*.

a hypothetical question, in which the VE was to consider a person of Plaintiff's age, education, and work experience, who was capable of medium work, with occasional climbing, kneeling, crouching, and crawling; frequent balancing and stooping; and avoidance of concentrated exposures. (AR 57–58.) The VE testified that such a person could perform Plaintiff's past relevant work, both per the DOT and as performed. (AR 58.) The ALJ asked a follow up question regarding a second hypothetical worker who could perform light work, with occasional bending, crouching, and other postural activities; no climbing ladders, ropes, and scaffolds; and avoidance of concentrated exposure to unprotected heights and hazardous machinery. (AR 58.) The VE testified that such a person could perform Plaintiff's past work, per the DOT. (AR 58–59.) The ALJ then posed to the VE a third hypothetical person who had the same limitations as the second except for no kneeling or squatting. (AR 59.) The VE testified that such a person could perform Plaintiff's past work, per the DOT. (AR 59.)

Plaintiff's attorney posed a fourth hypothetical to the VE of a person "limited to a sit and stand at will [and] should not kneel, squat, crawl, or do any lifting over 15 pounds." (AR 59.) The VE testified that such a person could not perform Plaintiff's past work, but could perform other, unskilled positions under the DOT in the national economy, such as booth cashier, DOT code 211.462-010 and SVP 2; ticket seller, DOT code 211.467-030 and SVP 2; and textile assembler, DOT Code 780.687-046 and SVP 1. (AR 59–60.)

Plaintiff asked the VE to consider a fifth hypothetical person who could not kneel, squat, crawl, bend, stoop; was limited to no prolonged standing, no excessive walking or any walking on rough or uneven surfaces; and could not lift more than 15 pounds. (AR 62.) The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform the jobs previously identified, except for textile assembler. (AR 63.) The VE testified that the fifth hypothetical person could perform the light job of seam presser, DOT code 789.687-166 and SVP 1. (AR 63.) Finally, for a sixth hypothetical, Plaintiff's attorney asked the VE to consider the same person as in the fifth hypothetical but with the lifting restriction changed to 10 pounds or less. (AR 64.) The VE testified Plaintiff could not perform her past work, or any other jobs, as such hypothetical would be at the sedentary level and there are no transferrable skills to that work. (AR

64.)

**C.     The ALJ's Decision**

In a decision dated March 7, 2018, the ALJ found that Plaintiff was not disabled, as defined by the Act. (AR 18–27.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520. (AR 20–26.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 24, 2014 (step one). (AR 20.) At step two, the ALJ found Plaintiff's following impairments to be severe: osteoarthritis of the knee and ankle, recalcitrant plantar fasciitis, and obesity. (AR 20.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three). (AR 21–22.)

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[5] and applied the RFC assessment at steps four and five. *See* 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff had the RFC:

> to perform less than the full range of light work as defined in 20 CFR [§] 404.1567(b). Specifically, [Plaintiff] is limited to the following: occasional climbing ramps/stairs, balancing, stooping, crouching and crawling, no climbing ladders, ropes, or scaffolds, no kneeling or squatting, and avoid concentrated exposure to unprotected heights and hazardous machinery.

(AR 22–23.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" she rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record." (AR 22.) The

---

[5] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id*. "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 883 (9th Cir. 2006).

ALJ found that, based on the RFC assessment, Plaintiff retained the capacity to perform her past relevant work as a pharmacy technician (step four). (AR 26.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on December 3, 2018. (AR 1–6.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

### III. LEGAL STANDARD

#### A. Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520). The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "If a claimant is found to be 'disabled' or

'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520).

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)). "However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.   Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

In reviewing the Commissioner's decision, the Court may not substitute its judgment for

that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

## IV.    DISCUSSION

Plaintiff contends that the ALJ erred in assessing the opinions of treating physician Dr. Lewis and examining physician Dr. Santaniello. (*See* Doc. 13.) The Commissioner counters that the ALJ properly evaluated the medical opinion evidence. (*See* Doc. 16.) The Court agrees with the Commissioner.

**A.    Legal Standard**

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.; Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). "To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions." *Cooper v. Astrue*, No. CIV S–08–1859 KJM, 2010 WL 1286729, at *2 (E.D. Cal. Mar. 29, 2010). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence." *Trevizo v. Berryhill*,

871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830. "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). "The ALJ must do more than state conclusions. [She] must set forth [her] own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

"[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). The regulations require the ALJ to weigh the contradicted treating physician opinion, *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001)[6], except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). The opinion of a non-examining professional, by itself, is insufficient to reject the opinion of a treating or examining professional. *Lester*, 81 F.3d at 831.

**B.   Analysis**

It is uncontested that Dr. Lewis treated Plaintiff, and is considered a treating physician. He opined in March 2016 that Plaintiff can perform "semi-sedentary work where she has the ability to sit and stand at will" and she should not "kneel, squat, crawl, or do any heavy lifting over 15 pounds." (AR 526.). In rendering his opinion, Dr. Lewis referenced the December 2014 opinion of examining physician Dr. Santaniello, who gave the same work restrictions. (*See* AR 549.)

Although not *specifically* identified by the ALJ as a basis for its rejection, Drs. Santaniello's and Lewis's opinion is contradicted by the opinions of examining physicians Drs. Scott and Nijjar. (AR 487–88 (Dr. Scott); AR 1841 (Dr. Nijjar).) Dr. Scott opined in July 2015 that Plaintiff was

---

[6] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 404.1527.

16

capable of light work with occasional postural activities (AR 487–88), and Dr. Nijjar opined in September 2017 that Plaintiff could return to her regular work, given that it did not require her to stand more than one hour at a time and lift, push, pull, or carry over thirty pounds (AR 1841).[7] Thus, the ALJ was required to state a "specific and legitimate reason," supported by substantial evidence, for rejecting the opinion of Drs. Santaniello and Lewis. *Trevizo*, 871 F.3d at 675.

In reviewing the medical evidence and giving "little weight" to the opinion, the ALJ stated that it is "inconsistent with the record as a whole." (AR 25.) An ALJ may properly discount a treating (or an examining) physician's opinion that is not supported by the medical record, including their own treatment notes. *See Valentine*, 574 F.3d at 692–93 (contradiction between physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting opinion); *Bayliss*, 427 F.3d at 1216 (same); *Batson v. Comm'r of Social Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."); *Khounesavatdy v. Astrue*, 549 F. Supp. 2d 1218, 1229 (E.D. Cal. 2008) ("[I]t is established that it is appropriate for an ALJ to consider the absence of supporting findings, and the inconsistency of conclusions with the physician's own findings, in rejecting a physician's opinion.").

Here, the ALJ rejected Dr. Santaniello's December 2014 and Dr. Lewis's March 2016 assessments of Plaintiff because she properly found they are not supported by the objective medical evidence and other evidence, particularly Plaintiff's normal physical examination findings from the time period both before and after those assessment.[8] As the ALJ noted (AR 24), Plaintiff's physical examination in August 2014 showed post-operative scars on her feet, with no swelling. (AR 1056.) Following Dr. Santaniello's examination in December 2014, Plaintiff was noted in

---

[7] The ALJ accorded "great weight" and "significant weight" to the opinions of Drs. Lewis and Nijjar, respectively. (AR 25–26.)

[8] Some of the evidence relied on by the ALJ in rejecting the medical opinion evidence of Dr. Santaniello and Lewis predated Plaintiff's alleged onset date of June 24, 2014. (*See, e.g.,* AR 24.) As Plaintiff correctly points out, treatment records that predate the alleged onset date "are not probative evidence of [the] plaintiff's functional impairments at the time [the plaintiff] allegedly became disabled." *Thomas v. Colvin*, No. 2:14-cv-1878-EFB, 2016 WL 1267935, at *3 (E.D. Cal. Mar. 30, 2016) (citing *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1164-65 (9th Cir. 2008) and *Burkhart v. Bowen*, 856 F.2d 1335, 1340 n.1 (9th Cir. 1988)). The Court therefore does not consider this evidence in determining whether the ALJ erred.

17

July 2015 to be able to get on and off the examination table, squat fully, and ambulate without difficulty. (AR 481.) Her left hip had no swelling and full range of motion. (AR 24, 485.) Plaintiff's knees and ankles showed no deformity, scars, or masses, and were stable with normal range of motion. (AR 24, 485.) Her straight-leg raising tests were normal, and no muscle weakness was noted. (AR 486–87.)

The ALJ observed (AR 24) that in January 2016, Plaintiff's muscle strength was normal (5/5) with no sensory deficits or asymmetries. (AR 498.) Plaintiff ambulated with no limp at her evaluation in May 2016 showed normal results in her hips. (AR 24, 1714.) Her knees had no deformity, effusion, retinacular laxity, instability, or tenderness, and her "McMurray and Apley grinding tests [were] negative." (AR 24, 1714.) Plaintiff ankles showed normal range of motion, with no deformity, localized tenderness, fusion, thickening, crepitus, or Varus or valgus deformity. (AR 1714–15.) Plaintiff's "peroneal tendons and posterior tibial tendons show[ed] no localized tenderness." (AR 1714.) Her feet also had no instability or deformity. (AR 1715.)

As the ALJ noted, several months after Dr. Lewis's assessment, in December 2016, Plaintiff had no signs of patellar tendonitis and no medial or lateral instability or tenderness. (AR 1735.). Her "McMurray and Apley grinding tests" were negative. (AR 1735.) Plaintiff's examination of her hips in September 2017 were normal, her right knee had good stability, and her "McMurray and Apley grinding tests" in this knee were negative. (AR 24, 1839.) Plaintiff's left knee had no crepitus or effusion. (AR 24, 1839.) Her alignment, stability, and range of motion were good, and her "McMurray and Apley grinding tests" in her left knee were also negative. (AR 24, 1839.) Plaintiff's neurological examination was normal. (AR 1839.) Plaintiff's ankles and feet showed no deformity, tenderness or effusion, with normal stability. (AR 24, 1840.)

Dr. Santaniello's examination and Dr. Lewis's own treatment notes also fail to support their opinion. As observed by the ALJ (AR 24), Plaintiff's examination by Dr. Santaniello showed no effusions or atrophy and no crepitation in her knees. (AR 24, 547.) Ligamentous testing revealed good stability. (AR 24, 547.) Dr. Lewis's examination in March 2016—the same day he rendered his opinion—found no obvious scars, deformity, atrophy, or edema in Plaintiff's knees, ankles, or feet. (AR 24, 521–22.) She maintained "full active and passive range of motion over the bilateral

ankles," but reported "some tightness at the end points in range of motion movement." (AR 24, 522.) No "gross instability" was noted. (AR 24, 522.) Dr. Lewis observed Plaintiff walk with a "non-antalgic gait without the use of a cane or any other assisting devices." (AR 24, 522.) Later, in March 2017, Dr. Lewis conducted a visual inspection of Plaintiff's right knee that revealed well healed post-operative scars, with no other deformities, masses, atrophy, or edema. (AR 24, 1798.) On examination of Plaintiff's knees in September 2017, Dr. Lewis observed that Plaintiff had "full flexion and extension of the left knee," but limited extension in her right knee. (AR 24, 1826.) Plaintiff was noted to ambulate without the use of a cane or any other assisted devices. (AR 241826.)

In addition, Plaintiff's "reported daily activities and exertional capacities" set forth in the record are not consistent with Drs. Santaniello's and Lewis's opinion that Plaintiff must be able to sit and stand and cannot kneel, squat, crawl, or lift anything over 15 pounds. (AR 24, 25.) The ALJ found, and Plaintiff does not dispute,[9] that "[d]espite her subjective complaints and difficulties, [Plaintiff] takes care of personal needs, does household chores including sweeping, mopping, vacuuming, washing dishes, and laundry, shops, cooks, drives, walks, rides with others, handles finances, reads, watches TV, bakes, does crafts, and socializes." (AR 24. *See also* AR 495.) Indeed, the record shows Plaintiff reported to Dr. Lewis in October 2016 that her activities of daily living had improved, including cleaning house, grooming, dressing, and preparing meals. (AR 24, 1776.) Dr. Lewis himself noted in March 2017 that with medications, Plaintiff is more capable of performing activities of daily living. (AR 24, 1825–26.) Plaintiff reported in September 2017—well after Drs. Santaniello and Lewis rendered their opinion—that her activities of daily living were, at most, "minimally affected" by her alleged impairments. (AR 24, 1835.)

To the extent that Plaintiff relies on *Embrey v. Bowen*, 849 F.2d 418 (9th Cir. 1988), for the proposition that the ALJ must discuss the evidence supporting a conclusion with enough specificity, s*ee* Doc. 13 at 8, *Embrey* is distinguishable. In *Embrey*, the court held that an ALJ's

---

[9] Plaintiff has not challenged the sufficiency of the evidence supporting the ALJ's adverse credibility finding in this case or the adequacy of the ALJ's reasons to explain this finding. Therefore, the Court considers the ALJ's unchallenged credibility finding to be binding. *See, e.g., Stanley v. Astrue*, No. 1:09–cv–1743 SKO, 2010 WL 4942818, at *6 (E.D. Cal. Nov. 30, 2010).

determination that objective findings do not support a treating physician's opinion is not, without more, a sufficiently specific reason to reject that opinion. 849 F.2d at 421–22. Here, as detailed above, the ALJ set forth in her opinion the objective medical evidence and Plaintiff's own reported daily activities showing that, contrary to Dr. Santaniello's and Lewis's assessment, Plaintiff can perform modified light work.

In sum, the ALJ identified ample objective medical evidence and other evidence in the record that undermines Drs. Santaniello's and Lewis's opinion that Plaintiff is capable of only "semi-sedentary" work. (AR 24, 25, 526, 549.) This is a specific, legitimate reason supported by substantial evidence for discounting this opinion. *See Magallanes*, 881 F.2d at 751; *see also Batson*, 359 F.3d at 1195; *Thomas*, 278 F.3d at 957. As the Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner, it will not disturb the ALJ's finding on this basis, even if, as Plaintiff points out (*see* Doc. 13 at 12), some of the above-described evidence could be construed more favorably to her. *See Robbins*, 466 F.3d at 882; *Thomas*, 278 F.3d at 954 (Where the evidence is susceptible to more than one rational interpretation, it is the Commissioner's conclusion that must be upheld.); *Batson*, 359 F.3d at 1196 ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ.").

## V.     CONCLUSION AND ORDER

After consideration of Plaintiff's and the Commissioner's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:     **June 26, 2020**                                        /s/ *Sheila K. Oberto*                     .
                                                                                         UNITED STATES MAGISTRATE JUDGE